**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

PILARICA F. FAIRHURST,

       Plaintiff,

vs.                                                                    CASE NO. 3:03CV601/RS

UNITED STATES OF AMERICA,

       Defendant.

_____/

## ORDER

### Introduction

Plaintiff Pilarica F. Fairhurst brought this medical malpractice action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §2679, *et seq*., because of medical care provided to her late husband at the Eglin Air Force Base hospital. Plaintiff alleged that the hospital and its staff negligently failed to timely diagnose and treat her late husband for multiple myeloma. The United States acknowledged liability, and the issue of damages only was tried by me.

### Facts

Plaintiff's late husband, James Fairhurst, was a retired Air Force sergeant who received medical care at the Eglin Air Force Base hospital. Sergeant Fairhurst had a long history of urinary problems extending back to the early 1990s. That history included recurrent lower and upper urinary tract infections, which were accompanied by symptoms of back pain. In March 2001, when he was 64 years old, he had another recurrence of his

1

usual symptoms of urinary tract infection, including back pain.  He was seen at the Eglin

Hospital several times during March, April, and May.  The record for a clinic visit on April

2nd notes "a two to three week history of some bilateral flank pain," which was thought to

possibly be due to kidney pathology.  An intravenous pyelogram, a radiologic procedure

which depicts the urinary tract, was abnormal.  An Eglin physician then ordered CT scans

of the upper abdomen and the pelvis for further follow up.  The CT scans were performed

on May 23, 2001, at a local civilian hospital and were interpreted by Dr. Barry Riggs, a

radiologist in private practice.  Dr. Riggs' report included the following finding:

> "The only significant finding is diffuse lytic disease of the skeleton.  Multiple
> myeloma would be the most common cause for this, but other etiologies and
> sources should be considered."

Dr. Riggs' report was transcribed the following day, May 24th, and was transmitted,

apparently by facsimile, to the Eglin hospital.  Dr. Riggs testified that he recalled, albeit

imprecisely, that he attempted to contact the physician at the Eglin hospital who ordered

the scans to alert the physician about the unexpected finding of possible multiple myeloma.

Dr. Riggs did not testify that he recalled actually communicating with the ordering physician.

Multiple myeloma is a plasma cell tumor which collects in the bone marrow.  The

concentration of myeloma cells in the bone marrow results in destruction of the bone.  The

lytic lesions described by Dr. Riggs are areas where the bone has been destroyed and are

a characteristic sign of advanced multiple myeloma.   Dr. Riggs testified that the lytic

lesions appeared like dissolved islands of bone.  His characterization of the lytic lesions as

diffuse in his report meant that the lesions were "anywhere you look, you find those spots."

Defendant's expert witness, Dr. Goldman, testified that multiple myeloma is not an

anatomic tumor, which begins as a small tumor and then spreads or metastasizes. Multiple myeloma appears at multiple places at once.  It is treatable but not curable.  It is a terminal illness which has the highest ratio of deaths to new cases of any cancer.    Multiple myeloma is treated by radiation, chemotherapy, and then possibly bone marrow transplants.  Radiation is administered to control pain.  Chemotherapy is administered initially to attempt to get the disease in to some degree of remission.  Treatment of multiple myeloma is palliative—to improve the quality of life and to extend life.  If multiple myeloma is not treated, median survival is less than one year.  The parties stipulated in the amended pretrial stipulation as admitted facts that patients who are promptly treated have mean survival of three years.  Dr. Goldman testified that the median survival with treatment for Stage III multiple myeloma is two and one-half years,   Stated differently, fifty percent of treated patients do not survive two and one-half years.

 Although plaintiff's expert, Dr. Kosierowski, was asked his opinion about Fairhurst's life expectancy had he been promptly treated, Dr. Kosierowski did not directly address the contention that patients with Stage III multiple myeloma have a median survival of two and one-half to three years.  He responded that his treatment goal would have been to keep Fairhurst's disease in remission "for a year or two" so that he could have then benefitted from newer drugs that had since come on the market.  Dr. Kosierowski did say, "I can only speak for overall myeloma.  But more than likely, he would have fallen into a fairly good prognosis myeloma.  But that is guessing at this point." [Emphasis supplied].

 The government admitted liability, and no testimony was presented from any other persons involved in Sergeant Fairhurst's care.  Incomplete medical records from the Eglin hospital were offered into evidence.  Although a diagnosis of Stage III multiple myeloma

is a medical emergency, and plaintiff's expert witness testified that treatment should have been instituted within a week of diagnosis, Sergeant Fairhurst was not seen by the Eglin oncologist until July 19, 2001, and the first treatment for multiple myeloma was not administered until sometime in August.  The first mention of multiple myeloma in the Eglin records is on June 18th when there is a handwritten entry about a CT of the abdomen with an apparent date of June 16th.  The reported findings of that CT, which include mention of "diffuse skeletal lytic defects," are virtually verbatim to the wording of Dr. Riggs' impressions in his May 24th report.  There is also an Eglin record dated June 8th which records a follow-up visit for low back pain.  The report does not mention the recent CT or Riggs' report but does contain a comment, "Originally thought [pain] was associated with UTI, but now seems to be independent of UTI..."   What happened to Dr. Riggs' report and why proper treatment was not promptly instituted remain a mystery.  Unfortunately, in the meantime and before treatment began, vertebrae in Sergeant Fairhurst's spine fractured due to the destruction of bone structure by multiple myeloma.  There is evidence in the record, unrefuted, that prompt treatment with radiation would have prevented the fractures.  Plaintiff's expert witness testified that if Sergeant Fairhurst's spinal cord had not been injured and he had remained ambulatory, there would have been less chance that he would develop infection.  However, there is also evidence in the record that chemotherapy, radiation treatment, and multiple myeloma itself all depress the immune system and that infection is a recognized complication.  Dr. Goldman testified that infection is a leading cause of early death with multiple myeloma.  Sergeant Faircloth did not tolerate the two cycles of chemotherapy which were administered, and his condition declined rapidly after the second cycle.  He developed severe systemic infection, and died on October 16, 2001.

4

Plaintiff's expert witness testified that after recurrences of back pain, which had been attributed to urinary tract infection, the physicians' diagnostic assessment should have been expanded by April 1 to include possible malignancy.   Dr. Kosierowski did concede, however, that it was not unreasonable in May 2000 to first attempt to rule out a recurrence of Sergeant Fairhurst's long history of urinary tract infections as the cause of his latest complaint of back pain.

Accordingly, the relevant time period for determination of damages is May 31st (Dr. Kosierowski testified that treatment should have been instituted within one week of the diagnosis of multiple myeloma) through October 16, 2001, the date of Sergeant Fairhurst's death.   The relevant life expectancy, but for defendant's negligence, would have been two and a half to three years.

### Conclusions of Law

1.   Plaintiff has satisfied all conditions precedent to bringing this action, including the requirement of 28 U.S.C. §2675(a).

2.   This court has jurisdiction pursuant to 28 U.S.C. §1346(b) and the Federal Tort Claims Act, 28 U.S.C. §§2671-80.

3.   The United States has stipulated that it is liable for the injuries sustained by plaintiff's late husband and by plaintiff.

4.   The applicable substantive law is that of Florida.  The claim asserted by plaintiff is properly brought as a survival action pursuant to Section 46.021, Florida Statutes (2001), for damages caused by personal injury to plaintiff's late husband and for plaintiff's loss of consortium and services.  Plaintiff's complaint made claims for damages which are recoverable only under the Florida Wrongful Death Act, Section 768.16, *et seq.* (2001).  At the conclusion of the plaintiff's case in chief, I ruled that this case is properly a survival action, not a wrongful death case.  In order to claim damages allowed only under the Florida Wrongful Death Act, the plaintiff was required to prove that Sergeant Fairhurst "more likely than not" would have survived if he had been timely diagnosed and treated.  *Gooding v. University Hospital*

*Building, Inc.*, 445 So.2d 1015 (Fla. 1984).  See also *Williams v. Bay Hospital, Inc.*, 471 So.2d 626 (Fla. 1ˢᵗ DCA 1985).  The evidence in this case is uncontradicted that multiple myeloma is an incurable fatal disease in virtually all cases.  Therefore, defendant's negligence is not a legal cause of Sergeant Fairhurst's death.

5.     Florida Statutes Section 46.021 provides:

> "**46.021 Actions; surviving death of party.**—No cause of action dies with the person.  All causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law."

Under Florida substantive law, plaintiff may recover as personal representative of her husband's estate the following damages for her husband's cause of action under the survival statute:  "Any bodily injury sustained by him and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for enjoyment of life."   Florida Standard Jury Instruction 6.2(a).   Plaintiff individually may recover for her loss of consortium and services:  "Any loss by reason of her husband's injury of his services, comfort, society and attentions..."   Florida Standard Jury Instruction 6.2(d).   No claim has been made for medical expenses, and there has been no proof of lost earnings.  I find that only non-economic damages can be awarded for Sergeant Fairhurst's injury.   Conceivably, there could have been a claim for Sergeant Fairhurst's loss of earnings during the period of June—October.   However, there is no persuasive evidence that Sergeant Fairhurst was employed during that time.  Although Mrs. Fairhurst testified that he and she had worked in a restaurant at a mall together, it appears that employment had ended sometime in the past.  Fairhurst's son testified that his parents worked at the mall until "about 97".  When he was asked about the financial impact of his father's death, the son replied "...all of the income that he was bringing in, his retirement, was gone." [Emphasis supplied].

The United States contends in its proposed conclusions of law that Mrs. Fairhurst cannot assert a claim for loss of her husband's services and consortium.  I have found no Florida legal authority that holds that a surviving spouse <u>cannot</u> bring a claim for loss of consortium and services with a survival action or any authority that directly holds that a spouse <u>can</u> bring such a claim.  However, the government's argument is neither persuasive nor logical.  The survival statute provides that an injured person's cause of action is not extinguished by the person's subsequent death.  There is no reason to preserve the claim of the deceased injured person but extinguish the claim of the living spouse.  The only result would be an unwarranted windfall to the tortfeasor.  The government cites *Williams v. Bay Hospital, Inc.*, *supra*, for support.  The viability of a claim by the surviving spouse for services and consortium was not an issue before the court in *Williams*.   The court's opinion states, "...the damages recoverable for this or other aspects of the claim, are a matter yet to be addressed in the trial of this cause."  *Id* at 730.  In *Swain v. Cury*, 595 So.2d 169 (Fla. 1st DCA 1992), which was not a survival action, the court specifically commented on the spouse's claim:

> "Finally, Mr. Swain's claim for loss of consortium is also connected to the evidence of what the future holds in store for Mrs. Swain, since, under the law, he is entitled to any loss by reason of his wife's injury, her services, comfort, society, and attentions in the future.  We would certainly not consider Mrs. Swain's premature death to be an insignificant event as it relates to her husband's potential loss of services, comfort, society, and attentions.  *Id* at 173.

## Sergeant Fairhurst's Damages

Sergeant Fairhurst's non-economic damages, which survive his death, are for pain and suffering because of the reduction in his life expectancy and loss of capacity for the

enjoyment of life caused by the delayed diagnosis and treatment.  See *Swain v. Curry*, 595

So.2d 168 (Fla. 1ˢᵗ DCA 1992); and *Williams v. Bay Hospital, Inc.*, *supra*.  I am aware of the

guidance of *Johnson v. United States*, 780 F.2d 902 at 907 (11ᵗʰ Cir. 1986):

> "In cases where damages for mental pain and suffering are allowed, it must
> bear some reasonable relation to the facts, the status of the parties, the
> amount allowed as compensatory damages, and the philosophy and trend
> of decisions affecting such conditions."

I have also considered *Williams v. United States*, 681 F.Supp. 763 (N.D. Fla. 1988).

*Williams* was a wrongful death case involving the death of a minor child, and the awards

in the other cases cited by the district judge were all for the wrongful death of a child.

Consequently, *Williams* provides no relevant guidance for this case.  Likewise, the awards

cited by plaintiff's counsel in his proposed findings of fact and conclusions of law were

wrongful death cases and a single survivorship action involving nursing home care.

Defendant has submitted awards or settlements in five cases during 1990-1998 and one

case in 2003.  In 1990, settlement of an untimely cancer diagnosis was $300,000.00.  A

1998 settlement of a delayed diagnosis of otherwise terminal cancer was $180,000.00.  A

net verdict in 1995 was $71,550.00 in a delayed diagnosis of lung cancer, although the

information provided does not identify whether the untimely diagnosis affected survival.  A

case involving failing to diagnose breast cancer resulted in a settlement of $233,000.00 in

1998.  A 1997 trial of delayed diagnosis of cancer resulted in a verdict for $115,800.00.

Only one case was relatively recent in 2003.  Consequently, the information about these

cases is of limited value in evaluating this case.  Nonetheless, the last four and a half

months of Sergeant Fairhurst's life were filled with great suffering, made all the more

intense, perhaps, by the realization that he should have been spared for another two and

8

a half years of life.   I therefore find and award damages to plaintiff, as Personal

Representative of the Estate of James M. Fairhurst, in the amount of $400,000.00 for

Sergeant Fairhurst's pain and suffering.

### Plaintiff's Damages for Loss of Services and Consortium

Plaintiff and her late husband were married in 1959.   They had a long and good

marriage.   The time allotted to them because of the untimely diagnosis and treatment was

tragically short—four and a half months.   Her loss during those months was not an

"insignificant event".   I therefore find and award damages to Pilarica F. Fairhurst,

individually, for loss of consortium in the amount of $100,000.00.

Plaintiff's counsel suggested at trial that plaintiff should be awarded $30.00 per week

for services previously performed by Sergeant Fairhurst, such as mowing the lawn,

washing the car, and repairing the house.   However, the plaintiff's son testified:

> "He started to—it was really noticeable, I think, the end of '99, 2000.  He was
> complaining about his back a lot.  He wasn't as active as he was before.  He
> wasn't out cutting the yard.  We'd sit inside and watch of it.  He wouldn't do
> a lot."

The testimony of a close friend, George Menas, suggested that Sergeant Fairhurst had

stopped providing those services sometime before May 2001:

> "...I believe that may have been part of the reason he had to stop driving
> those trucks and doing anything that was manual—any serious manual
> labor."

I find there is no competent evidence to support an award to plaintiff for loss of her

husband's services.

9

IT IS ORDERED that the clerk shall enter judgment in favor of Palarica F. Fairhurst, individually, and against the United States of America, in the amount of $100,000.00 and shall enter judgment in favor of Palarica F. Fairhurst, as Personal Representative of the Estate of James M. Fairhurst, and against the United States of America, in the amount of $400,000.00.

ORDERED on August 1, 2006.

/S/ Richard Smoak
RICHARD SMOAK
UNITED STATES DISTRICT JUDGE